THE HUG COMPANY, A CORPORATION, PETITIONER, *v.* WAR CONTRACTS PRICE ADJUSTMENT BOARD, RESPONDENT.

Docket No. 754–R.   Promulgated April 18, 1950.

*Albert A. Jones, Esq.,* and *John W. Snider, C. P. A.,* for the petitioner.

*John F. Wolf, Esq.,* and *James D. Lynch, Esq.,* for the respondent.

626

630

OPINION.

TURNER, *Judge*: The respondent contends that the petitioner was in common control with C. J. Hug during 1945 within the meaning

of section 403 (c) (6) of the Renegotiation Act[1] and paragraphs 348.2 and 348.4 of the Renegotiation Regulations[2] issued pursuant thereto and that therefore the petitioner is subject to renegotiation under the act for the fiscal year ended December 31, 1945, since the total amount of its and C. J. Hug's renegotiable sales for 1945 was in excess of $2,000,000. The petitioner contends that it was not under common control with Hug and that, since its renegotiable sales were less than $500,000, it is not subject to renegotiation for its fiscal year 1945.

The respondent's position is that the control shown to have been exercised by C. J. Hug in all phases of the petitioner's operations establishes that he was in actual control of the petitioner during 1945

---

[1] This subsection shall be applicable to all contracts and subcontracts, to the extent of amounts received or accrued thereunder in any fiscal year ending after June 30, 1943, whether such contracts or subcontracts were made on, prior to, or after the date of the enactment of the Revenue Act of 1943, and whether or not such contracts or subcontracts contain the provisions required under subsection (b), unless (A) the contract or subcontract provides otherwise pursuant to subsection (i), or is exempted under subsection (i), or (B) the aggregate of the amounts received or accrued in such fiscal year by the contractor or subcontractor and all persons under the control of or controlling or under common control with the contractor or subcontractor, under contracts with the Departments and subcontracts (including those described in clause (A), but excluding subcontracts described in subsection (a) (5) (B)) do not exceed $500,000 and under subcontracts described in subsection (a) (5) (B) do not exceed $25,000 for such fiscal year. If such fiscal year is a fractional part of twelve months, the $500,000 amount and the $25,000 amount shall be reduced to the same fractional part thereof for the purposes of this paragraph.

[2] 348.2 Computation of Aggregate Receipts and Accruals.
(1) In order to qualify for this exemption a contractor must meet two conditions—
(a) The gross receipts or accruals of the contractor and his affiliates for his fiscal year from subcontracts within the scope of subsection (a) (5) (B) of the 1943 Act (that is, for services in procuring contracts or subcontracts) must not exceed $25,000 ; and
(b) The gross receipts or accruals of the contractor and his affiliates for his fiscal year from all contracts with the Departments and from all subcontracts within the scope of subsection (a) (5) (A) of the 1943 Act, including contracts and subcontracts exempt from renegotiation under subsection (i) of the 1943 Act but excluding subcontracts covered in (a) above, must not exceed $500,000.
(2) Affiliate is used in this paragraph 348 to refer to a person who controls or is controlled by or under common control with the contractor. Total receipts or total billings under cost-plus-fixed-fee contracts are included in gross receipts or accruals in computing the limits referred to in this paragraph 348. For the purpose of applying this provision of the Act gross receipts and accruals will be computed without the elimination of intercompany sales.
348.4 Tests of "Control". In determining whether the contractor controls or is controlled by or under common control with another person, the following principles should be followed :
(1) *Corporate Control:* A parent corporation which owns more than 50% of the voting stock of another corporation controls such other corporation and also controls all corporations controlled by such other corporation.
(2) *Individual Control:* An individual who owns more than 50% of the voting stock of a corporation controls the corporation and also controls all corporations controlled by the corporation.
(3) *Partnership Control:* A general partner who is entitled to more than 50% of the profits of a partnership controls the partnership.
(4) *Joint Venture Control:* A joint venturer who is entitled to more than 50% of the profits of a joint venture controls the joint venture.
(5) *Other Cases:* Actual control is a question of fact. Whenever it is believed that actual control exists even though the foregoing conditions are not fulfilled, the matter may be determined by the Department or Service conducting the renegotiation.

for the purposes of the above quoted provisions of the Renegotiation Act and the regulations. The petitioner denies that Hug had actual control of the petitioner prior to July 14, 1945, which was subsequent to the receipt of the renegotiable receipts involved herein.

The petitioner takes the position that the question of control in the instant case is to be determined on the basis of Hug's stock ownership in the petitioner rather than on other grounds. The act contains no definition of, nor any limitations or restrictions as to the basis of, the "control" referred to in the provisions of section 403 (c) (6). In view of that, a determination made on the limited basis suggested by the petitioner would write into the section an unwarranted limitation.

Hug, who had had long experience as a contractor, became president and director of the petitioner at the time of its organization in 1922 and continued as such through 1945. While it is not disclosed whether he was also its general manager prior to November 19, 1942, he was its general manager from that date through 1945. In addition, he is shown to have been the owner of the largest amount of the petitioner's stock at various times after November, 1942, down to May, 1945, when he acquired ownership of more than one-half of the petitioner's total outstanding shares, and to July 14, 1945, when he acquired ownership of more than one-half of the stock in Hug Acceptance Corporation, which in turn owned more than one-half of the petitioner's new stock.

At the stockholders' meetings held on February 18, 1943, February 17, 1944, and February 22, 1945, Hug, through his ownership of voting units in the petitioner and the proxies held by him for other voting units, had control of more than one-half of the voting units represented at such meetings. Such control was aside from and independent of the 13,403 shares of the petitioner's new stock which were owned by Hug Acceptance Corporation and represented at such meetings, and which we have found were voted by Hug, as president of that corporation.

Some argument is made by the petitioner that, since it continued in default from late in 1941 through 1945, the holders of the new stock and the note holders, until the notes were paid in August, 1944, had the right to elect four of the petitioner's seven directors and that, since Hug did not own a majority of such stock and notes and did not, until July 14, 1945, acquire a majority of the stock in Hug Acceptance Corporation, which owned a majority of such stock, he could not be said to have been in stock control of the petitioner prior to July 14, 1945. While the holders of the new stock and the notes had the right to elect four directors in the case of the petitioner's default in certain respects the evidence clearly establishes that no action was taken by them to-

ward that end. Apparently they did not consider that their right was worth exercising, or, if exercised, would result in any greater benefit to them than if not exercised. Directors of the petitioner continued to be elected in the same manner as if no default had occurred and as if the holders of new stock and notes had no greater right in the election of directors than the holders of the old stock. The former directors of the petitioner continued to be reelected as before. Since the holders of the right to elect four directors apparently attached no importance to the right when they could have exercised it, we are unable to see why any importance should be attached to it here. In this connection it is observed that the plan pursuant to which the new stock was issued provided that the new stock in the petitioner issued to Hug Acceptance Corporation should be represented and voted by a proxy or proxies of that corporation designated and elected by the stockholders of that corporation. Despite the fact that no such designation of proxy or proxies was ever made, Hug, as president of that corporation and without a proxy, voted its new stock in the petitioner, which was a majority of such stock. So far as is shown, his action in so doing was never called in question by any one.

The resolution adopted at the annual meeting of the petitioner's stockholders held on February 22, 1945, to take steps toward a dissolution of the petitioner discloses that such action was taken in compliance with "the desire and wish of C. J. Hug, President and General Manager of the Company, that all of the companies with which he is connected be dissolved as soon as possible after all their obligations are paid." The resolution also authorized the transfer and assignment of all of the petitioner's contracts to Hug as of December 31, 1944, and, so far as shown, without any consideration to be paid by him therefor. While the foregoing resolution to dissolve conforms in some respects to a resolution adopted by the petitioner's board of directors on August 17, 1944, the adoption of the latter resolution, hereinafter discussed, was a result of Hug's action.

From the situation presented, we think the conclusion that Hug controlled the annual meetings of the petitioner's stockholders is inescapable.

Hug's actual control of the petitioner's directors is well illustrated by the action taken by them at their meeting on August 17, 1944, after being informed that Hug was going to bid on a renewal of the Granite City contract for himself. Without the services of Hug and with no one to put in his place, it was apparent to the directors that the petitioner was in no position to attempt to bid against him for a renewal of the contract or, if successful in that respect, it was in no position to perform the contract. Hug had a strangle hold on the petitioner, and that he was planning to tighten it was apparent to the directors.

Their action at that meeting in authorizing the assignment to Hug of the unexpired portion of the petitioner's Granite City contract, and in directing that the petitioner take on no new work or contracts except as necessary in connection with certain leases, and if at all possible the petitioner dispose of all its then outstanding contracts, claims, and accounts by December 31, 1944, was the beginning of the end of the petitioner's war contract work. The end came on January 1, 1945, when the petitioner subcontracted to Hug the unexpired portion of its second Highland contract.

At their meeting on November 24, 1944, the directors of the petitioner authorized the payment as of January 1, 1945, of all accrued and unpaid dividends on the petitioner's new stock, including dividends thereon for 1944, provided the petitioner's auditor determined that the 1943 and 1944 earnings were sufficient for such purpose. The directors also authorized the retirement of the petitioner's new stock as soon as all reorganization obligations were liquidated and the petitioner's financial condition, in the opinion of Hug, justified doing so. While the record is silent as to the amount of the petitioner's earnings in 1943 and 1944, it does show that at the close of 1944 the petitioner had assets totaling approximately $693,000, of which $535,000 was cash and Treasury bonds. The only liabilities shown were current liabilities totaling $296,000. With net assets of approximately $400,000, of which approximately $225,000 represented cash, it would appear that, since the petitioner had disposed of its war contracts and was not taking on any new business, some steps would have been taken by the petitioner at least toward payment of dividends on the new stock, if not also toward its retirement. The annual dividend on the new stock was approximately $7,500. While it is not shown what amount had accumulated, it is shown that the dividends on that stock had been cumulative only since December 31, 1941. Instead of action being taken toward paying dividends and retiring the stock as the directors had directed, Hug, in January, 1945, without the authorization of the petitioner's stockholders or its board of directors, borrowed $300,000 from the petitioner, or approximately 43 per cent of its total assets, on his unsecured notes and used the money for paying his individual income tax and financing his Granite City contract. Approximately two months later he began buying up, at $8 a share, the petitioner's new stock, which was retirable at par of $10 a share plus accumulated dividends. Without the repayment to the petitioner of his loan, Hug continued thereafter in 1945 to buy up stock in the petitioner, both old and new, and in Hug Finance Corporation until he became the owner of a large majority of the stock in each corporation.

From the foregoing we think it is clear that Hug not only controlled the petitioner's board of directors, but that when they took action which he later desired to disregard he did so without referring the matter back to them.

Hug's large borrowings from the petitioner in 1944 and 1945 under the circumstances presented show the complete control he exercised over the petitioner's liquid assets and how, when he desired to do so, he devoted them to his personal use without compensation to the petitioner.

Since Hug controlled the meetings of the petitioner's stockholders, controlled petitioner's board of directors, and controlled petitioner's operations and assets to the extent here shown, we conclude that he was in actual control of the petitioner at all times during 1945 prior to July 14, 1945, after which date he was concededly in control by reason of his stock ownership. Accordingly, we hold that during 1945 Hug controlled the petitioner within the meaning of section 403 (c) (6) of the Renegotiation Act and that, since the petitioner's and Hug's renegotiable sales were in excess of $2,000,000, the petitioner is subject to renegotiation under the provisions of the act.

The parties have stipulated that, if it be held that the petitioner was subject to renegotiation, it had excessive profits within the meaning of the act for its fiscal year 1945 of not less than $200,000. We have found as a fact accordingly.

*An order will be entered in accordance herewith.*