CHARLES ZARKIN, LEWIS PUDNOS, SAMUEL FEIERTAG, BORIS WENGEL, AND LEO SIEGEL, CO-PARTNERS, DOING BUSINESS AS ZENITH EXPORT & PROCESSING CO., 332 E. 28TH STREET, NEW YORK, NEW YORK, PETITIONERS, *v.* UNITED STATES OF AMERICA, RESPONDENT.

Docket No. 815–R.   Filed January 13, 1958.

*Robert R. Daly, Esq.*, for the petitioners.
*David V. Seaman, Esq.*, for the respondent.

### OPINION.

TRAIN, *Judge:* Pursuant to the Renegotiation Act of 1943, the respondent unilaterally determined that the petitioner Zenith Export & Processing Co. realized excessive profits in its fiscal years ended August 31, 1944 and 1945, in the amounts of $10,000 and $35,000, respectively.

The only issue to be decided is whether the petitioner was under the control of, or controlling, or under common control with Zarkin Machine Co., Inc., within the meaning of section 403 (c) (6) of the Renegotiation Act of 1943.[1]

All the facts have been stipulated and are hereby found as stipulated.

Zenith Export & Processing Co., hereinafter referred to as Zenith, was organized as a partnership on September 27, 1943, by petitioners Charles Zarkin, Lewis Pudnos, Samuel Feiertag, Boris Wengel, and Leo Siegel, each having an equal partnership interest. The partner-

---

[1] Sec. 403 (c) (6) provides:

This subsection shall be applicable to all contracts and subcontracts, to the extent of amounts received or accrued thereunder in any fiscal year ending after June 30, 1943, whether such contracts or subcontracts were made on, prior to, or after the date of the enactment of the Revenue Act of 1943, and whether or not such contracts or subcontracts contain the provisions required under subsection (b), unless (A) the contract or subcontract provides otherwise pursuant to subsection (i), or is exempted under subsection (i), or (B) the aggregate of the amounts received or accrued in such fiscal year by the contractor or subcontractor and all persons under the control of or controlling or under common control with the contractor or subcontractor, under contracts with the Departments and subcontracts (including those described in clause (A), but excluding subcontracts described in subsection (a) (5) (B)) do not exceed $500,000 and under subcontracts described in subsection (a) (5) (B) do not exceed $25,000 for such fiscal year. If such fiscal year is a fractional part of twelve months, the $500,000 amount and the $25,000 amount shall be reduced to the same fractional part thereof for the purposes of this paragraph.

ship was organized for the specific purpose of engaging in the business of packing commodities, including machinery parts, for export, and it was thus engaged during the 1944 and 1945 fiscal years here involved. All of the sales made by Zenith during the period in question were pursuant to contracts or subcontracts as defined in the Renegotiation Act. During its fiscal years 1944 and 1945, Zenith had sales of $127,859.18 and $215,135.66, respectively. Each of these amounts was less than the statutory $500,000 minimum which a contractor's renegotiable sales must aggregate in any fiscal year before the contractor is subject to renegotiation. Renegotiation in this case was based on a finding of the Navy Price Adjustment Board that during the entire period in question Zenith and Zarkin Machine Co., Inc., were under common control. Sec. 403 (c) (6), *supra* note 1. The combined renegotiable sales of Zenith and Zarkin Machine Co., Inc., hereinafter referred to as Zarkin Machine, were substantially in excess of $500,000 in each fiscal year involved.

Zarkin Machine is a corporation organized under the laws of the State of New York in 1928. During the years in question, Charles Zarkin was the legal or beneficial owner of all of the outstanding stock of Zarkin Machine, acted as its president and chief executive officer, and was in actual, as well as legal, control of Zarkin Machine.

The respondent contends that Charles Zarkin, personally and through his corporation, Zarkin Machine, had actual control of or the power of control over Zenith and, since he also controlled Zarkin Machine, that the two business entities were under his common control within the meaning of section 403 (c) (6) and Renegotiation Regulations 348.4 [2] during the years here involved.

We agree with the respondent.

The question of control is one of fact to be determined in light of the entire factual background. *Hoffman* v. *United States*, 23 T. C. 569 (1954). Actual control rather than legal control is determinative. *Hug Co.* v. *War Contracts Price Adjustment Board*, 14 T. C. 621 (1950). We conclude, in view of all the facts, that Zenith and

[2] 348.4 Tests of "Control". In determining whether the contractor controls or is controlled by or under common control with another person, the following principles should be followed:

(1) *Corporate Control:* A parent corporation which owns more than 50% of the voting stock of another corporation controls such other corporation and also controls all corporations controlled by such other corporation.

(2) *Individual Control:* An individual who owns more than 50% of the voting stock of a corporation controls the corporation and also controls all corporations controlled by the corporation.

(3) *Partnership Control:* A general partner who is entitled to more than 50% of the profits of a partnership controls the partnership.

(4) *Joint Venture Control:* A joint venturer who is entitled to more than 50% of the profits of a joint venture controls the joint venture.

(5) *Other Cases:* Actual control is a question of fact. Whenever it is believed that actual control exists even though the foregoing conditions are not fulfilled, the matter may be determined by the Department or Service conducting the renegotiation.

Zarkin Machine, though separate businesses, were under the common control of Charles Zarkin during the fiscal years in question.

Prior to the formation of Zenith, when Zarkin Machine had received orders for parts which required special processing and packaging for overseas shipment, it intended to subcontract the work. However, Jerome L. Reinitz, the factory superintendent of Zarkin Machine, was informed by an Army inspector that there was no contractor in the general area that could perform this operation, and that earlier experiences in shipments overseas had resulted in failures. Charles Zarkin then directed Reinitz to attend a school run by the Quartermaster Corps to ascertain the type of processing and packaging required. After attending the school, Reinitz suggested to Charles Zarkin that Zarkin Machine enter the business of processing and packaging for overseas shipment; Zarkin refused but gave Reinitz permission to go into the packaging business while remaining factory superintendent for Zarkin Machine. Thereupon, Reinitz formed a partnership with Murray Schlessinger on or about August 1, 1943, thus providing the processing and packaging service required by Zarkin Machine. Almost immediately, the new business prospered. In September 1943, Charles Zarkin became interested in the business and at that time the partnership here involved was created.

The new partnership, Zenith, acquired the business of Reinitz and Schlessinger, and in consideration therefor Charles Zarkin paid Schlessinger $2,300. Thus, it was Zarkin's money that bought out Reinitz' partner, not that of the newly formed partnership. Reinitz and Zenith entered into an employment agreement whereby Reinitz became general manager of Zenith. This agreement, executed solely by Charles Zarkin on behalf of Zenith, provided that Reinitz was to receive as a commission a certain percentage of all sales to Zenith's accounts other than to Zarkin Machine. While Reinitz was not made a partner in Zenith, he was its first general manager and, although Gene Fabio became general manager sometime in 1944, Reinitz continued to work for the partnership throughout the period in question.

These facts surrounding the organization of Zenith demonstrate that Charles Zarkin was instrumental in the development of the packaging and processing business and was the moving force behind the formation of the partnership. As an equal partner he had no greater legal authority to do this organizing and acting for the partnership than did his copartners. Nevertheless, they silently acquiesced in his actions. Such acquiescence is evidence of Zarkin's leading position in and actual control of Zenith. *Hoffman* v. *United States, supra; Hug Co.* v. *War Contracts Price Adjustment Board, supra.*

Of Zarkin's four partners, Leo Siegel and Samuel Feiertag were his brothers-in-law, Boris Wengel was his first cousin by marriage,

and Lewis Pudnos was his cousin. All of them except Leo Siegel were employed by Zarkin Machine prior to and during the fiscal years in question. Only one of them, Lewis Pudnos, a shipping clerk for Zarkin Machine, worked for Zenith; he acted as a consultant in problems involving packaging and shipping. He and Zarkin were the only partners authorized to sign checks for the partnership.

Since Zarkin's copartners were his close relatives, they were subject to the influence of family relation and, with one exception, they were Zarkin Machine employees, which necessarily gave Zarkin a degree of control over them. *Lowell Wool By-Prod. Co.* v. *War Contracts Price Adjustment Board*, 14 T. C. 1398 (1950), affd. 192 F. 2d 405 (C. A., D. C. 1951); *Hug Co.* v. *War Contracts Price Adjustment Board, supra.* Though equal partners, they participated in Zenith only to the extent of making a small contribution to capital. Lewis Pudnos alone worked for Zenith; the others took absolutely no part in the management or rendered any services. Only Zarkin received any compensation from Zenith. Zarkin effectively dominated his copartners, the group having legal control of Zenith.

Benjamin Poller, brother-in-law of Charles Zarkin, was attorney for Zarkin Machine and became attorney for and supervised the office work of Zenith, including such matters as billing and disbursements. According to the partnership agreement, Poller was the sole arbitrator of any disputes and questions which might arise among the partners. Poller played a major role in inducing Charles Zarkin to go into the packaging business, in bringing in his relatives, and getting the partnership organized as a family enterprise.

Reinitz, as general manager of Zenith, and Poller, as office supervisor and attorney for Zenith and final arbitrator of partnership disputes, had immediate control of Zenith. Because of their respective relationships to Zarkin, Reinitz, factory superintendent of Zarkin Machine, and Poller, attorney for Zarkin Machine and Zarkin's brother-in-law, were subject to Zarkin's influence and control. See *Pechtel* v. *United States*, 18 T. C. 851 (1952); *Lowell Wool By-Prod. Co.* v. *War Contracts Price Adjustment Board, supra; Hug Co.* v. *War Contracts Price Adjustment Board, supra.* Although others superseded Reinitz as general manager, he continued to work for Zenith, and it has not been shown that his authority in Zenith was lessened.

Each partner contributed $500 to partnership capital. However, this $2,500 of working capital proved insufficient to meet the demands of the business. Therefore, Zarkin Machine made advances to Zenith which were utilized for payroll, materiel purchases, and working capital. During Zenith's fiscal year 1944, Zarkin Machine advanced to Zenith $27,584.15 to help meet a payroll totaling $50,255.73, and

paid wages of $7,160.70 to 11 of its own employees used by Zenith. In the same year Zarkin Machine also advanced $4,386.60 for petty cash, and paid various bills for Zenith in the amount of $15,660.96. In fiscal year 1945, Zarkin Machine charged Zenith the sum of $2,373.36 for labor used and cash advanced for Zenith's payroll which totaled $58,546.73.

As of the end of February 1944, Zarkin Machine had advanced to Zenith a total of $30,136.87, part of which had been repaid, but in anticipation of D–day, June 6, 1944, the needs of the services for packaging were such that the volume of business greatly increased. By August 31, 1944, Zenith had received total advances of $82,105.73 from Zarkin Machine, and at the end of the first fiscal year, a balance of $23,580.52 remained due from Zenith to Zarkin Machine. The average amount of debt owed by Zenith to Zarkin Machine at the end of each month during fiscal year 1944 was $5,890.26, and the average during fiscal year 1945 was $6,124.94. The average amount of cash on hand for each month during fiscal year 1944 was $5,088.44 and the average during fiscal year 1945 was $11,549.

All of these advances of money were later repaid to Zarkin Machine by Zenith.

During Zenith's fiscal year 1944, approximately 10.9 per cent of its gross sales were to Zarkin Machine, which ranked third in number of sales in a total of 105 customers. During Zenith's fiscal year 1945, approximately 12.4 per cent of its gross sales were to Zarkin Machine, which ranked first in number of sales in a total of 96 customers.

Thus, substantially all of Zenith's working capital during its first fiscal year and a considerable portion its second year was supplied by Zarkin Machine. It advanced to Zenith over one-half of its first year's payroll. The facts disclose these and other important benefits that Zenith received from Zarkin Machine, including loans, labor, and patronage, upon which Zenith was dependent for its existence To the extent that Zenith was economically dependent on Zarkin Machine, Charles Zarkin through his corporation exercised an element of control over Zenith. See *Lowell Wool By-Prod. Co.* v. *War Contracts Price Adjustment Board, supra; Pechtel* v. *United States, supra; Warner* v. *War Contracts Price Adjustment Board*, 14 T. C. 1320 (1950).

The partnership agreement provided that the partners were to share in profits equally but $100 per week was to be first paid and was so paid to Charles Zarkin for services to be rendered. He acted as Zenith's financial adviser, performing no other services. Zarkin never had anything whatsoever to do with the solicitation of business for Zenith, obtaining orders, or producing the orders.

On March 25, 1945, the active business of Zenith ceased with the sale of some of its assets to persons not otherwise here involved.

That Zenith and Zarkin Machine were separate entities and engaged in different types of businesses is not controlling. *Haas* v. *United States*, 23 T. C. 892 (1955); *Hoffman* v. *United States*, *supra*. The facts show that Zenith was a family enterprise, controlled and dominated by Charles Zarkin to some extent directly and in other respects through Zarkin Machine.

Petitioner cites *Southland Steel Co.* v. *War Contracts Price Adj. Bd.*, 13 T. C. 652 (1949), in support of its contention that common control was not present here, but that case is clearly distinguishable.

We hold that petitioner Zenith Export & Processing Co. and Zarkin Machine Co., Inc., were under the common control of Charles Zarkin within the meaning of section 403 (c) (6) of the Renegotiation Act of 1943, and that the said petitioner realized excessive profits in its fiscal years 1944 and 1945 of $10,000 and $35,000, respectively.

*An order will be entered accordingly.*